# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. __1:23-mj-03829 LOUIS__

UNITED STATES OF AMERICA

vs.

**JUAN ANDRES DONATO BAUTISTA,**

Defendant.
_____/

FILED BY_____ *TS* ____D.C.

*Sep 19, 2023*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   NO

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   NO

3.  Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?                                                                                 NO

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:     *Robert J. Emery*
        Robert J. Emery
        Assistant United States Attorney
        Southern District of Florida Court
        No. A5501892
        99 N.E. 4th Street, 7th Floor
        Miami, Florida 33132
        Tel.: 305-961-9421
        Fax: 305-536-7213
        Email: Robert.emery2@usdoj.gov

AO 91(Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | | |
| | ) | Case No. | **1:23-mj-03829 LOUIS** |
| Juan Andres Donato Bautista, | ) | | |
| | ) | | |
| | ) | | |
| _Defendant._ | | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____July 2015 to October 2017____ in the county of _____Miami-Dade_____ in the _____Southern____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), and 1957(a), all in violation of 18 U.S.C. § 1956(h) |
| 18 U.S.C. § 1956(a)(2)(A) | Promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) |
| 18 U.S.C. § 1956(a)(2)(B)(i) | Concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i) |

This criminal complaint is based on these facts:

#### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Colbert Almeida, Special Agent - HSI
_Printed name and title_

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date:  September 19 2023

_____
_Judge's signature_

City and state:          Miami, Florida

Hon. Lauren F. Louis, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A CRIMINAL COMPLAINT

I, Colberd Almeida, being first duly sworn hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a Complaint charging Juan Andres "Andy" Donato Bautista ("BAUTISTA") with conspiring to launder monetary instruments and conspiring to engage in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), and 1957(a), all in violation of 18 U.S.C. § 1956(h); and laundering and attempted laundering of monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(a)(2)(B)(i) (collectively referred herein as the "Criminal Offenses").

2.      I am a Special Agent with the U.S. Department of Homeland Security's Homeland Security Investigations ("HSI"). I have been employed in this capacity since March 2003. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).

3.      Since 2017, I have been assigned to the HSI Miami Field Office's Illicit Proceeds and Foreign Corruption ("IPFC") Group, a group that investigates money laundering and foreign corruption. In my role as a Special Agent, and particularly while working within the IPFC Group, I have received training and gained experience related to investigations involving foreign corruption, money laundering, fraud, and other financial crimes – including, but not limited to: conducting or participating in surveillance and undercover operations; obtaining and executing search and seizure warrants and arrest warrants; interviewing witnesses, informants, and

cooperating defendants; and acquiring and analyzing electronic data and communications as well as foreign and domestics business and financial records.  Through my training and experience, I have also become familiar with various money laundering methods that persons engaged in such criminal activity take to avoid detection from law enforcement, including making payments through third parties or utilizing offshore shell companies or bank accounts to conceal the nature and origin of the funds; creating false documentation, such as a loan or a contract agreement, to give the appearance of legitimacy to an illegal payment; structuring payments to avoid bank or regulatory reporting requirements; and using coded language to hide the criminal nature of communications.

4.      In addition, from approximately May 2001 through February 2003, I was employed by HSI's legacy agency, the United States Customs Service, as a Special Agent.  I am also a graduate of the Federal Law Enforcement Training Centers in Glynco, Georgia, where I have received training on law enforcement tools and techniques used to investigate violations of federal law – including those involving foreign corruption and money laundering.

5.      The information contained in this affidavit is based on, among other things, my participation in the investigation, information provided by other individuals – including sworn law enforcement officers, foreign law enforcement officials, witnesses, and confidential sources; my review of relevant documents – including foreign and domestic business and financial records as well as email and text communications; and my training and experience as a federal agent and the training and experience of other federal agents.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include each and every fact known to me or learned during the course of this investigation.

6.      All dates, times, and amounts stated herein are approximate.  I have summarized conversations of emails and text messages unless otherwise indicated.  Quotations and summaries of emails or messages in Spanish are based on draft translations.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the Criminal Offenses have been committed by BAUTISTA.

## SUMMARY OF RELEVANT DOMESTIC AND FOREIGN STATUTES

8.      Title 18, United States Code, Section 1956(a)(2)(A) prohibits money laundering in the United States involving international transfers and attempted transfers either to or from the United States with the intent to promote the carrying on of a specified unlawful activity.

9.      Title 18, United States Code, Section 1956(a)(2)(B)(i) prohibits money laundering either to or from United States where the transaction or attempted transaction is designed in whole, or in part, to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity.

10.      Title 18, United States Code, Section 1957(a) prohibits money laundering by engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specific unlawful activity.

11.      Title 18, United States Code, Section 1956(h) prohibits conspiracies to violate the offenses defined in Title 18, United States Code, Sections 1956 and 1957.

12.      Title 18, United States Code, Section 1956(c)(7) states that, for a financial transaction occurring in whole or in part in the United States, specified unlawful activity includes an "offense against a foreign nation involving . . . bribery of a public official, or the

3

misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"
and "any felony violation of the Foreign Corrupt Practices Act."

13.     Pursuant to the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States
Code, Section 78dd-2 prohibits "domestic concerns"—which include individuals who are
citizens, nationals or residents of the United States as well as companies that are incorporated in
the United States or have their principal place of business in the United States—or any officer,
director, employee or agent of such domestic concern or stockholder acting on behalf of such
domestic concern, from making use of the mails or any means or instrumentality of interstate
commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the
payment of any money, or offer, gift, promise to give, or authorization of the giving of anything
of value, to a foreign official or to a person, while knowing that all or part of such money or thing
of value would be and had been offered, given, or promised to a foreign official, for purposes of
(i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such
foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii)
securing any improper advantage; or (iv) inducing such foreign official to use his influence with
a foreign government or agencies or instrumentalities thereof to affect or influence acts or
decisions of such government or agencies or instrumentalities, in order assist the domestic
concern to obtain or retain business for or with, or direct business to, any person.  15 U.S.C. §
78dd-2(a) and (h)(1)(A)-(B).

14.     Furthermore, Title 15, United States Code, Section 78dd-3 prohibits any
"person"—other than an issuer or a domestic concern—while in the territory of the United States,
from corruptly making use of the mails or any means or instrumentality of interstate commerce
or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the

4

payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order to assist such person to obtain or retain business for or with, or direct business to, any person. 15 U.S.C. § 78dd-3(a) and (f)(1).

15.     From my review of criminal laws of the Republic of the Philippines (collectively, the "Philippine Penal Code") in effect during the relevant time period, the Philippine Penal Code contains the following provisions, in pertinent part, relating to bribery of a public official:

*Bribery – Revised Penal Code*

a.    Art. 210. *Direct bribery* – Any public officer who shall agree to perform an act constituting a crime, in connection with the performance of his official duties, in consideration of any offer, promise, gift or present received by such officer, personally or through the mediation of another, shall suffer the penalty of *prision mayor* in its medium and minimum periods and a fine of not less than three times the value of the gift in addition to the penalty corresponding to the crime agreed upon, if the same shall have been committed.

b.    Art. 211. *Indirect bribery* – The penalties of *prision correccional* in its medium and maximum periods, suspension and public censure shall be imposed upon any public officer who shall accept gifts offered to him by reason of his office.

5

*Anti-Graft and Corrupt Practices – Republic Act No. 3019*

   c. Section 3. Corrupt practices of public officers. — In addition to acts or omissions of public officers already penalized by existing law, the following shall constitute corrupt practices of any public officer and are hereby declared to be unlawful:

     (b) Directly or indirectly requesting or receiving any gift, present, share, percentage, or benefit, for himself or for any other person, in connection with any contract or transaction between the Government and any other party, wherein the public officer in his official capacity has to intervene under the law. . ..

     (e) Causing any undue injury to any party, including the Government, or giving any private party any unwarranted benefits, advantage or preference in the discharge of his official administrative or judicial functions through manifest partiality, evident bad faith or gross inexcusable negligence. This provision shall apply to officers and employees of offices or government corporations charged with the grant of licenses or permits or other concessions.

## BACKGROUND

*Philippine Official and Related Entities*

   16. The Commission on Elections ("COMELEC") of the Republic of the Philippines (the "Philippines") was an independent agency mandated to enforce and administer election laws in the Philippines.  COMELEC was a "department," "agency," or "instrumentality" of the Philippines as those terms are used in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

   17. BAUTISTA served as the Chairman of COMELEC from on or about April 28, 2015, to in or around October 2017.  BAUTISTA was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

*United Kingdom Companies, U.S. and Philippine Subsidiaries, Employees and Associates*

18.    Company 1, headquartered in the United Kingdom, was a holding company that funded subsidiaries, including Company 2 and Company 3.

19.    Company 2 was an election voting machine and service provider company that was privately held under the Company 1 parent corporate structure. Company 2 had offices world-wide and was headquartered in the United Kingdom. During the time of the Criminal Offenses, Company 2 had at least one employee working and residing in the Southern District of Florida.

20.    Company 3, a subsidiary of Company 1 and Company 2, was located and headquartered in Boca Raton, Florida. Company 3 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

21.    Company 4 was a joint-venture and subsidiary of Company 1 and Company 2, that was formed in the Philippines in 2015 to bid for contracts relating to the 2016 elections in the Philippines, as set forth below. The joint venture included, among others, Company 2 and Vendor A (described below).

22.    In or around the later part of 2015 and into 2016, Company 4 won bids for three contracts worth a total approximate value of one hundred ninety-nine million dollars ($199,000,000) to supply COMELEC with voting machines and related services for the May 2016 elections for President, Vice-President, and other official positions.[1]

23.    Co-Conspirator 1 was a co-founder and President of Company 2. Co-Conspirator 1 also served on the Board of Directors for Companies 1 and 2. Co-Conspirator 1 maintained a

---

[1] All dollar amounts referenced herein are estimates in U.S. dollars (USD), unless otherwise indicated.

residence in the Southern District of Florida since in or around 2009. He became a lawful permanent resident of the United States in or around January 2019. Co-Conspirator 1 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

24.     Co-Conspirator 2 worked as Executive Vice-President for Companies 2 and 3 in Boca Raton, Florida. Company 3 paid his salary. He managed hardware development and manufacturing—worldwide—for Company 2. Co-Conspirator 2 became a United States citizen in 2004 and he maintained a residence in the Southern District of Florida since 1993. Co-Conspirator 2 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

25.     Co-Conspirator 3 was a Company 2 executive involved in Company 4's contracts with COMELEC in the Philippines. He served as project manager for Company 4 in the Philippines who signed and implemented the 2016 election contracts. Co-Conspirator 3 was a "person" as that term is used in the FCPA, 15 U.S.C. § 78dd-3(a) and (f)(1).

26.     Co-Conspirator 4 lived in Panama, and he had a business relationship with Company 2 and its subsidiaries. Co-Conspirator 4 was a "person" as that term is used in the FCPA, 15 U.S.C. § 78dd-3(a) and (f)(1).

*Taiwanese Company, Employees, and Related Shell Companies*

27.     Vendor A was a company based in Taiwan that manufactured hardware for electronic products for Companies 2, 3, and 4. Vendor A partnered with Company 2 to form the joint venture—Company 4—that bid on and was awarded contracts to supply voting machines and related services to the Philippines for its 2016 elections.

28.     Vendor A-President was president and owner of Vendor A.

29.     Vendor A-Employee was a director/officer and shareholder of Vendor A.  Vendor A-Employee was a close relative of Vendor A-President.

30.     Baumann Enterprises Limited ("Baumann") was a foreign shell company incorporated in the British Virgin Islands in or around 2010.  BAUTISTA as well as two close relatives owned and/or were beneficial owners of Baumann.

31.     Shell Company X was a foreign shell company incorporated in Anguilla in or around 2014.  Vendor A-President owned and exercised control over Shell Company X.

32.     Shell Company Y was a foreign shell company incorporated in Brunei in or around 2011.  Vendor A-Employee was listed as a director of Shell Company Y and the primary account user for Shell Company Y's bank account in Hong Kong.  Vendor A-President owned and exercised control over Shell Company Y.

*Related Philippine Entities*

33.     Philippine Metals Company was a company incorporated in the Philippines in or around 1994.  Philippine Metals Company purported to be, among other things, an exporter, importer, and manufacturer of metals and metal products.

34.     Philippine MSB Company was a registered money services business ("MSB") incorporated in or around 2010 that operated in the Philippines.

## **OVERVIEW OF THE SCHEME TO PAY BRIBES TO BAUTISTA**

35.     In or around August 2017, BAUTISTA's wife informed Philippine National Bureau of Investigation ("NBI") agents that her husband had large amounts of unexplained wealth.[2]   She informed NBI's Anti-Fraud Division that her husband had approximately one

---

[2] The NBI is an agency of the Philippine government under the Philippine Department of Justice, responsible for handling and solving major high-profile or complex criminal cases in the interest of the nation.

billion Philippine Pesos, or approximately $20 million USD, of "ill-gotten wealth." At their residence, she found foreign bank account information for Baumann, Shell Company X and Shell Company Y, that she previously did not know existed. Additionally, at the residence, BAUTISTA's wife also discovered stacks of cash of Philippine pesos and approximately thirty-five (35) "Passbooks" identifying multiple cash deposits at bank accounts in the Philippines held in BAUTISTA's and family members' names that she previously did not know about.

36.     Based, in part, on this information, HSI initiated an investigation that focused on employees of Companies 2, 3, and 4 and their use of various overseas bank accounts of the Companies' vendor to bribe BAUTISTA—a Philippine government official—for lucrative election voting machine and related services contracts with COMELEC for the 2016 Philippine elections. In addition, the investigation focused on BAUTISTA's acts to launder his bribe proceeds related to the scheme.

37.     As described in greater detail below and summarized in the attached flow chart, BAUTISTA, in his capacity as Chairman of COMELEC, received and attempted to receive bribes from Co-Conspirators 1, 2, 3, 4, and Vendor A, in exchange for using his position as Chairman of COMELEC to assist Company 2, Company 4, and others to obtain and retain business and improper advantages, including payments from COMELEC, in violation of the FCPA and the Philippine laws against the bribery of a public official. Co-Conspirators 1, 2, 3, and 4 furthered the criminal scheme using personal email accounts and messaging applications to avoid detection, and in particular, Co-Conspirators 1 and 3 used email accounts registered under aliases.

38.     To conceal and disguise the bribe payments, Co-Conspirators 1, 2, 3, 4, and Vendor A-President, together with others, caused or attempted to launder at least $4,000,000

through foreign and U.S. bank accounts for the benefit of BAUTISTA, in violation of U.S. money laundering laws.

## THE BRIBERY AND MONEY LAUNDERING SCHEME

39.     From my review of emails, text messages, contracts, documents, bank records, witness interviews, and from my participation in this investigation, I have learned, among other things, the following:

40.     From on or about April 28, 2015, to in or around October 2017, BAUTISTA, as Chairman of COMELEC, had influence and decision-making authority relating to the awards, oversight, and payments for three contracts to supply COMELEC with voting machines and related services for the May 2016 elections for President, Vice-President, and other official positions.  As a government official, BAUTISTA was required to file a yearly Sworn Statement of Assets, Liabilities and Net Worth ("SALN").  For 2015 and 2016—the years that BAUTISTA was required to file a SALN as COMELEC Chairman—he failed to list his interest in Baumann.

41.     In or around October 2014, COMELEC opened the bidding process for the lease of, with the option to buy, 23,000 election machines and related services for the 2016 elections ("Contract 1").  On or about July 30, 2015, BAUTISTA, in his capacity as COMELEC Chairman, awarded the bid for Contract 1 to Company 4, the joint venture that included Company 2 and Vendor A.  Co-Conspirator 3, on behalf of Company 4, and another COMELEC commissioner, on behalf of COMELEC, signed Contract 1 because BAUTISTA was unavailable.  For Contract 1, COMELEC agreed to pay Company 4 approximately $53,763,481, in installments, and upon Company 4 meeting certain milestones during the contract.  Per the contract, only when BAUTISTA, or his designee, certified that Company 4 had met a milestone could COMELEC issue a payment to Company 4.

42.     In or around May 2015, COMELEC opened the bidding process for the lease of, with the option to buy, 70,977 election machines and related services ("Contract 2"). On or about August 27, 2015, COMELEC awarded the bid for Contract 2 to Company 4. BAUTISTA, as COMELEC Chairman, and Co-Conspirator 3, on behalf of Company 4, signed Contract 2. For Contract 2, COMELEC agreed to pay Company 4 approximately $134,670,877, in installments, and upon Company 4 meeting milestones during the contract. Per the contract, only when BAUTISTA, or his designee, certified when Company 4 had met a milestone could COMELEC issue a payment to Company 4.

43.     In or around March 2015, COMELEC opened the bidding process for services related to transmission of results for the 2016 elections ("Contract 3"). On or about February 9, 2016, COMELEC awarded the bid for Contract 3 to Company 4 for the 2016 Philippine elections. BAUTISTA, as COMELEC Chairman, and Co-Conspirator 3, on behalf of Company 4, signed Contract 3. For Contract 3, COMELEC agreed to pay Company 4 approximately $10,642,488, in installments, and upon Company 4 meeting milestones during the contract. Per the contract, only when BAUTISTA, or his designee, certified when Company 4 had met a milestone could COMELEC issue a payment to Company 4.

*Company 2 Created Slush Funds in the Philippines and Hong Kong*

44.     Based on my training and experience and my involvement in this investigation, I believe that to effectuate their criminal scheme to obtain the 2016 Philippine election contracts, Co-Conspirators 1, 2, 3, 4, and others, created "slush funds" in the Philippines, Hong Kong, and elsewhere.

A.      **First Slush Fund**

45.     In or around 2014, a Company 2 subsidiary executed a two-million-dollar contract with Vendor A to design election equipment for the 2016 Philippine elections. As noted above, around this time, COMELEC had announced the bidding for Contract 1. Regarding the importance of the Philippines contracts to Companies 1 and 2, Co-Conspirator 2 told a former president of Vendor A that Co-Conspirator 2's bosses, which included Co-Conspirator 1, were "**seriously considering in closing [sic] the company (Worldwide!!!) next year** if we cannot apply, compete, and win the Philippines bid!" (bold and underline in original). Company 2 advanced funds and paid Vendor A a total of two million U.S. dollars pursuant to the contract. A large of amount of these funds went unused by Vendor A. Based on my training and experience, the pool of excess funds which were not returned to the company, but were transferred to shell companies, indicates that the original contract was over-invoiced to create a slush fund. In an email to Vendor A, Co-Conspirator 2 wrote that he needed to check with his "boss" as to whom and where to send the excess of $1,000,000. At the time, Co-Conspirator 1 supervised Co-Conspirator 2. Instead of returning the money to Company 2 and/or its subsidiary, Co-Conspirator 2 directed Vendor A to transfer large amounts of U.S. dollars from Shell Company X and Shell Company Y through foreign and U.S. bank accounts, to various Swiss bank accounts of shell companies owned by Co-Conspirator 1 based on fictitious contracts.[3]

---

[3]   Notably, in or around June 2017, from one of these shell companies' bank accounts in Switzerland, Co-Conspirator 1 directed a funds transfer of approximately $1.3 million to a bank account in the United Arab Emirates that belonged to a company Co-Conspirator 4 owned. In or around July 2017, Co-Conspirator 4 then directed a wire transfer to a company's bank account in the Philippines.

**B.**     **Second Slush Fund**

46.     In relation to the creation of another slush fund, the Co-Conspirators funneled funds through Co-Conspirator 4's companies.  On or about December 15, 2015, Co-Conspirator 4 sent an email with an attached spreadsheet entitled "Philippines Pot" (translated from Spanish) to Co-Conspirator 3 at a personal email account.[4]  The spreadsheet attached to Co-Conspirator 4's email listed multiple payments to Co-Conspirator 4 totaling $2,340,000 from Company 2. The spreadsheet recorded various U.S. dollar denominated payments Co-Conspirator 4 appears to have made from his personal and business bank accounts to bank accounts of several Philippines companies, including Philippine MSB Company.  In the spreadsheet, Co-Conspirator 4 projected to receive $3,657,500 from Company 2.  As discussed below in Paragraph 65, the Co-Conspirators used the same Philippine MSB Company bank account to funnel payments to BAUTISTA.

47.     According to bank documents obtained during the investigation, Co-Conspirator 4 executed some of the wire transfers to bank accounts of Philippine companies, including Philippines MSB Company, on the same day or soon after he received payments from Company 2.  Many of the payments predated the awards of Contracts 1, 2, and 3, but occurred after the bidding processes for the Contracts were opened.  Co-Conspirator 4 and his companies identified during this investigation were not on a list of vendors for Companies 2, 3, and 4 pertaining to the election voting machine and related services contracts with COMELEC that was provided to U.S. law enforcement by counsel for Companies 2, 3, and 4.

---

[4] Based on my training and experience, and familiarity with this case, I have reason to believe that usage of the terms "Philippines Pot" related to the creation of a slush fund, particularly as the spreadsheet recorded payments from Company 2 as well as outgoing wire transfers from various personal and business accounts in the name of third parties to companies in the Philippines.

48.     Emails lawfully obtained during this investigation indicate that Co-Conspirator 4 created fake contracts to obscure the true source of the funds sent to Philippine bank accounts described above and to conceal the recipient(s) of payments listed in the spreadsheet.  For example, Co-Conspirator 4 recorded a payment dated August 26, 2015, in the spreadsheet to Philippine MSB Company for $72,000.  An official from Co-Conspirator 4's bank questioned the wire transfer and requested supporting documentation.  Despite Philippine MSB Company being registered as an MSB, Co-Conspirator 4 provided the bank as supporting documentation for the wire transfer receipts purporting to show that he purchased furniture from Philippine MSB Company.  Co-Conspirator 4 emailed Co-Conspirator 1 expressing concerns about the bank's inquiries, and in response, Co-Conspirator 1 suggested submitting a receipt for services provided or something else to justify the wire transfer and indicated that he thought that this would satisfy the bank because they planned to send more transfers to Philippine MSB Company.  Co-Conspirator 4 responded to Co-Conspirator 1 that he could not do what Co-Conspirator 1 suggested because of the large amount of the transfer and that the transfer originated from his personal account.  After the bank twice rejected supporting documentation for the alleged furniture purchase, Co-Conspirator 4 submitted a completely different justification for the wire transfer—a consulting agreement between himself and Philippine MSB Company that had nothing to do with furniture.

**C.     Third Slush Fund**

49.     Co-Conspirator 2 created the third slush fund from Company 2's 2015 contract with Vendor A to pay Vendor A approximately $56,117,790 to build 98,447 voting machines for the 2016 Philippine elections.  Company 2 and Vendor A generated the slush fund by creating over-invoiced contracts.  The purchase order—#5134—for one of the contracts designated the

voting machine the "1800 Plus."   An Excel spreadsheet attached to an email located in Vendor

A-Employee's personal email account detailed an itemized cost for purchase order #5134 of $570

for each 1800 Plus voting machine.   This same spreadsheet included an "Extra Fee" of $50 per

machine, and a total "Extra Fee" amount of $4,922,350.   The spreadsheet also listed "Extra Fee"

for other items apparently related to the 2016 Philippine elections for a total "Extra Fee" amount

of $4,961,350.   In a March 2016 series of emails, Vendor A-President informed Co-Conspirator

2 that approximately $5,900,000 in unused buffer funds from this contract belonging to Company

2 remained in the bank accounts of Shell Company X and Shell Company Y.   Co-Conspirator 2

referred to $4,961,350 of these unused funds as his "boss's" as he had similarly described in an

email referenced in Paragraph 45, which I believe was a reference to Co-Conspirator 1, who was

Co-Conspirator's 2 immediate supervisor and president of Company 2.[5]

      50.      For one of the bank accounts in the Philippines, in email communications lawfully

obtained by law enforcement, from in or around May 2016, Co-Conspirator 1 instructed Co-

Conspirator 2 to create a contract to support payments to another company—Philippine Metals

Company.   Co-Conspirator 1 sent Co-Conspirator 2 the articles of incorporation for Philippine

Metals Company in support of the scheme to create the false documentation to justify wire

transfers to Philippine Metals Company.   Co-Conspirator 1 informed Co-Conspirator 2 that

Philippine Metals Company was one of the companies they ought to use to send the payments and

that they wanted to start with "150k" and to later increase the amounts.   Based on my training and

experience and my involvement in this investigation, I believe that "150k" refers to $150,000 USD

---

[5] The spreadsheet detailed in this Paragraph likewise contained a $10 cost called the "Rue," with
a total amount of $984,470.   During this investigation, HSI determined that Vendor A-President
wired a portion of the "Rue" funds from Shell Companies X and Y to bank accounts in the Southern
District of Florida belonging to Co-Conspirator 2 and another Company 3 employee.

and later increases to that amount when referring to making future payments. Co-Conspirator 1 also told Co-Conspirator 2, who received the email in Southern District of Florida, "to create" the contract that would be needed to support the wire transfers.

51.     Later in May 2016, Co-Conspirator 3, using an alias email account, forwarded a contract to Co-Conspirator 1, who in turn emailed it to Co-Conspirator 2. The contract detailed four payments from Shell Company X to Philippine Metals Company for a total of $1,350,000 and was for the fictitious purchase of iron ore and copper from Philippine Metals Company.

52.     In a series of emails from in or around June 2016 to in or around July 2016, Co-Conspirator 2 informed Co-Conspirator 1 that approximately $750,000 had been sent to Philippine Metals Company from Shell Company X's bank account. During the same time period, Co-Conspirator 1 instructed Co-Conspirator 2 not to make any more payments because they were owed something.[6] In a subsequent email exchange, Co-Conspirator 1 informed him that they had started getting paid so Co-Conspirator 2 could move forward on the payment. On or about August 20, 2016, Co-Conspirator 2 emailed Co-Conspirator 1 informing him that all payments had been completed to Philippine Metals Company.

53.     My review of the contract between Philippine Metals Company and Shell Company X described above and related email communications revealed several irregularities. First, the 2016 contract contained an annex which detailed the purported sale of iron ore, yet the delivery dates for the iron ore per the contract referenced the years 2008 and 2009. Second, according to export records received from the Philippines, Philippine Metals Company never exported any

---

[6] Notably, around this time, Company 4 was awaiting payments by COMELEC on Contracts 1, 2, and 3. As indicated above, pursuant to the contracts, BAUTISTA, or his designee, had to first sign a milestone certification to trigger the issuance of a payment by COMELEC.

goods to Shell Company X in 2016. Third, at no time did Co-Conspirators 1, 2 and 3 use their company employee email accounts to facilitate these transactions. Lastly, in my review of bank records for Philippine Metals Company, almost immediately after the funds were sent from Shell Company X to Philippine Metals Company, wire transfers in the same or similar amounts were sent from Philippine Metals Company to Philippine MSB Company. In my training and experience, I believe this is a common money laundering method known as layering that is used to disguise the origin, destination, and true purpose of the funds transfer. As explained in the following paragraphs, the Co-Conspirators later used Philippines Metals Company and Shell Companies X and Y to funnel payments to BAUTISTA.

*Bribe Payments to BAUTISTA*

54.     As described in more detail below, Company 2, Company 3, and Company 4 employees – including Co-Conspirators 1, 2, and 3 – directed or caused Vendor A-President to send bribe payments from the third group of slush funds held in Shell Company X and Shell Company Y bank accounts, which Vendor A-President controlled, to BAUTISTA's bank account in the name of Baumann at a bank in Singapore. Co-Conspirators 1, 2, 3, and Vendor A-President disguised these payments totaling $1 million to BAUTISTA as fictitious loans to Baumann, a company located outside of the Philippines, while BAUTISTA was Chairman of COMELEC. Again, Company 2 employees and Vendor-A created this slush fund related to the Philippines 2016 elections through over-invoicing.

55.     In an email dated August 12, 2016, Co-Conspirator 2 wrote Vendor A-President that they "will move 1 MM as a 'loan' to a Virgin Island Company." On August 15, 2016, with the subject line "Re:4th Item – LOAN," Vendor A-President suggested to Co-Conspirator 2 to use the third fund from Shell Company X and Shell Company Y to pay the "loan." Based on my

training, experience, and overall familiarity with this investigation, payments from the third slush fund referenced in Paragraph 49, in part, were disguised as "loans" to pay bribes to BAUTISTA through Baumann, a shell company incorporated in the British Virgin Islands. The following were examples of some of those wire transfers to BAUTISTA:

### A. August 16, 2016 Attempted Transfer of $500,000 for the Benefit of BAUTISTA

56.     On or about August 16, 2016, Co-Conspirator 2 directed Vendor A-President, via electronic messaging, to transfer $500,000 from Shell Company Y's bank account in Hong Kong to Baumann's bank account in Singapore. According to bank records, BAUTISTA was identified through Baumann's Articles of Incorporation as a beneficial owner of the company and as a signatory on Baumann's bank account in Singapore. The wire transfer instructions listed "D.L." at a Singapore bank as the point of contact for the transfer and listed the purpose of the wire transfer as "LOAN AGREEMENT 2016." The wire instructions also listed a bank in New York as the intermediary for the wire transfer. The purported loan contract between Baumann and Shell Company Y to justify the wire transfer, included a signature that appears to be that of a known close relative of BAUTISTA, who signed the contract on behalf of Baumann. Based on, among other things, electronic messages that I have reviewed between the Conspirators, there is good cause to believe this loan contract was not legitimate and was intended to disguise the true nature of the above-referenced transfer, which was a bribe payment to BAUTISTA. Vendor A-President sent the $500,000 wire transfer, and it passed through an intermediary bank in New York. However, this wire transfer never arrived at Baumann's bank account due to an issue at the originating bank. As discussed below, the Co-Conspirators re-sent this $500,000 to Baumann on August 29, 2016.

57.     Prior to the August 16th wire transfer, on or about August 10, 2016, Co-Conspirator 1 texted Co-Conspirator 2, while Co-Conspirator 2 was in the Southern District of Florida, indicating that he (Co-Conspirator 1) drafted the loan contract because there was a lot of pressure to make the payment—which, based on the context of the conversation as well as my training, experience and involvement in the case, I believe to refer to pressure from BAUTISTA—and that they had to execute the purported loan contract to effectuate the payment.[7] Co-Conspirator 2 responded that he would send the wire transfer next week, but that he had not sent the wire transfer yet as he was a little scared about doing so because the wire transfer involved "this country" and the country could be a "pain." Based on my training and experience, Co-Conspirator 2 referenced the United States when he wrote "this country" because he resided in the United States at the time.  In a subsequent email to Co-Conspirators 1 and 2, dated August 11, 2016, Co-Conspirator 3 attached a draft loan agreement for $1,000,000 between Baumann and Shell Company X.  In a text conversation dated August 15, 2016, Co-Conspirator 1 told Co-Conspirator 2 that Co-Conspirator 3 sent Co-Conspirator 2 the wire instructions and that they were getting paid so they could immediately execute the "loan."  In a text message sent from Co-Conspirator 2 to Co-Conspirator 1, on or about August 15, 2016, while Co-Conspirator 2 was located in the Southern District of Florida, Co-Conspirator 2 stated that the wire transfer was a lot of money to send, so he may have to break up the wire transfer into "500" for each transfer. Based on my training and experience and my involvement in this investigation, this comment referred to the one-million-dollar transfer payment that Co-Conspirator 1 wanted to send, and that it would have to be sent in two payments of $500,000 each in order to avoid scrutiny from

---

[7] Discussed *infra*, BAUTISTA and a close relative purchased a residence in San Francisco, California on August 31, 2016.

the bank(s) involved in the transaction.  Co-Conspirator 1 then instructed Co-Conspirator 2 by text message, dated August 15, 2016, to send the wires urgently as the pressure to send the payment was "horrible."

58.    In a text conversation the next day, on or about August 16, 2016, Co-Conspirator 2 told Co-Conspirator 1 that the one-million-dollar loan payment had to be divided into two loan payments with "500" being "lent" by Shell Company X and "500" by Shell Company Y.  In summary, Co-Conspirator 2 explained that the wire transactions had to be separated so that they fell in different weeks and explained this was because it was a lot of "salsa" to send to the "north." Based on my training and experience, the context in which the terms were used and my knowledge of the case, I believe that the term "north" refers to the United States and "salsa," refers to money, and that the Co-Conspirators were discussing dividing the payment into two smaller payments to help avoid drawing suspicion from authorities or banks in the United States.

59.    In an email exchange from on or about August 16, 2016, to on or about August 17, 2016, between Co-Conspirators 1, 2, and 3, Co-Conspirator 2 informed Co-Conspirators 1 and 3 that "in order to minimize the risk for the Lenders, the loans will come from 2 different companies for 500,000 US$ each."  Co-Conspirator 3 asked, "Cant [sic] they both be done on Wednesday?"  Co-Conspirator 2 responded, "[U]nfortunately the amount is too big to transfer the same day.  Please see attached confirmation for the first loan of 500K.  PS: Please send me the loan agreements signed!"  Co-Conspirator 3 replied, "I though [sic] we could have it signed by a fictitious name, and in that case, somebody there could sign.  Isn't that the case anymore?"

**B.    August 22, 2016, Attempted Transfer of $500,000 for the Benefit of BAUTISTA**

60.    On or about August 22, 2016, the Co-Conspirators sent a second wire transfer of approximately $500,000 for a fictitious loan, per documents provided to the bank to justify the

wire transfer, from an account in Hong Kong in the name of Shell Company X, through a U.S. correspondent bank in New York, to BAUTISTA's Baumann bank account in Singapore. Again, the wire transfer instructions listed "D.L." at the bank as the point of contact for the transfer and the justification for the transfer was listed as "BUSINESS LOANS." A signature on the loan contract on behalf of Baumann submitted to a bank in support of the wire transfer again appears to be that of a known close relative of BAUTISTA. As with the other wire transfer, it passed through an intermediary bank in New York, but this wire transfer never arrived at Baumann's bank account due to the same issue at the originating bank. As discussed in Paragraph 63, the Co-Conspirators resent the $500,000 to Baumann on August 31, 2016.

**C.      August 29, 2016, Transfer of $499,975 for the Benefit of BAUTISTA**

61.      As set forth above, the Co-Conspirators sent two $500,000 payments from Shell Companies X and Y that passed through the United States financial system but never arrived at BAUTISTA's Baumann bank account in Singapore due to the issues referenced above. Text messages from approximately in or around August 2016 through in or around September 2016, between Co-Conspirator 2 and Vendor A-President corroborate this information. For instance, in these messages, Co-Conspirator 2 and Vendor A-President discussed the problems that they encountered with the wire transfers and that the bank(s) involved in the wire transactions returned both payments. In the text messages described above, Vendor A-President confirmed that a bank returned the funds and that he would resend the funds to Baumann's bank account at the bank in Singapore.

62.      After the above-described text message exchange, based on bank account information obtained by law enforcement, on or about August 29, 2016, Vendor A-President sent to BAUTISTA's bank account in Singapore, in the name of Baumann, approximately $499,975,

from Shell Company X, to the attention of "D.L." and for "BUSINESS LOANS." This wire transfer passed through a U.S. correspondent bank in New York. In the text messages described above, Co-Conspirator 2 confirmed that the beneficiary—whom, based on the context of the conversation as well as my training, experience, and involvement in the case, was BAUTISTA— received the wire transfer. Bank records also verified that this wire transfer arrived in BAUTISTA's bank account held in the name of Baumann in Singapore.

**D.     August 31, 2016, Transfer of $500,000 for the Benefit of BAUTISTA**

63.     Based on bank documents obtained by law enforcement, on or about August 31, 2016, Vendor A-President resent BAUTISTA's Baumann bank account in Singapore approximately $500,000 from Shell Company Y to the attention of "D.L.," with the justification of "LOAN AGREEMENT 2016." Again, this wire transfer passed through a U.S. correspondent bank in New York. In a text message, Co-Conspirator 2 confirmed to Vendor A-President that the beneficiary—whom, based on the context of the conversation as well as my training, experience, and involvement in the case, I believe to be BAUTISTA—received the wire transfer. Bank records also verified that this wire transfer arrived in BAUTISTA's bank account held in the name of Baumann in Singapore.

*Bribe Payments Redirected to BAUTISTA by Philippine Companies*

64.     Based on my review of emails, some written in Spanish, and bank records received from BAUTISTA's bank in Singapore, I learned that BAUTISTA's bank account held in the name of Baumann ultimately received approximately $1,000,000 (two wire transfers of approximately $500,000 each) from Co-Conspirators 1, 2, 3, and Vendor President-A through Shell Companies X and Y. However, after the funds arrived in the account, compliance officials at BAUTISTA's bank requested supporting documentation for the wire transfers from Shell Companies X and Y.

23

Ultimately, the account holder, BAUTISTA, failed to convince bank officials that the wire transfers were legitimate through supporting documentation and the bank returned both wire transactions to Vendor A-President's bank accounts for Shell Companies 2 and 3, in October 2016. For reasons discussed in the following paragraphs and based on my experience in foreign corruption and money laundering matters, I have learned that the Co-Conspirators resent the funds using Philippine companies to BAUTISTA.

65.     After banking officials at BAUTISTA's bank directed the return of the $1,000,000 to Shell Companies X and Y in October 2016, Co-Conspirator 2 directed Vendor A-President to wire these funds in another way to mask the origin and destination of the funds. From in or around December 2016 through in or around February 2017, the Co-Conspirators redirected these funds, including approximately $900,000, through Philippine Metals Company to Philippine MSB Company's bank account.[8] On or about December 6, 2016, Co-Conspirator 2 emailed Vendor A-President the following:

> Remember the 2 500's T/T returned?
> We need to pay that 1MM to [Philippine Metals Company].
> You did some transfers before to them, so you should have all the information; the contract is still valid so I think it should not be a problem to pay them.
> Please let me know what do you need in order to start sending the payments…
>
> I suggest to send as follows:

---

[8]  In another email sent in early March 2017, Vendor A-President, at the direction of Co-Conspirators 2 and 3, wired the remaining $100,000 as a "donation" to an organization in the Philippines. Based on training and experience, the totality of the evidence shows that this was not a "donation"; rather it was another bribe to BAUTISTA given that in the email conversation, Co-Conspirator 2 and Vendor A-President discussed resending the rejected $1,000,000 intended for BAUTISTA's Baumann, to Philippine Metals Company and a "donation" to an organization. They discussed wiring $900,000 to Philippine Metals Company and $100,000 as a "donation." The payments to Philippine Metals Company and the "donation" totaled approximately $1,000,000. Additionally, Co-Conspirator 2 sent Vendor A-President a letter from the Philippine organization thanking Shell Company Y for the $100,000 donation a week before Vendor A-President had even wired the funds.

WED 07DEC 297,500$
FRI 09DEC 262,700$
TUE 12DEC 268,800$
THU 14DEC 171,000$

Please let me know...

65.     Based on my training and experience and my involvement in this investigation, I believe the above communication was a reference to the Co-Conspirators resending the one million dollars that was intended for BAUTISTA, through a different company.   After sending the schedule in the preceding paragraph, Vendor A-President sent Co-Conspirator 2 a revised wire transfer schedule in an email, to which Co-Conspirator 2 replied, "do the first ASAP in order to calm down the recipient people..." Vendor A-President said he would transfer as soon as he could, but asked if the Philippines Metals Company could provide an invoice to Shell Company X. Additionally, the timing of the contract and the irregularities set forth above in paragraph 53, among other things, confirm that the entire contract between Shell Company X and Philippine Metals Company—to include the modifications—was not a real contract.   Further, in a prior text conversation sent, in part, on or about August 15, 2016, from the Southern District of Florida, between Co-Conspirators 1 and 2, they referenced "metals" and "loan" in the same exchange. Based on my training and experience and my involvement in this investigation, I know that the word "metals" was part of the name of Philippine Metals Company and "loan" was a reference to the justification documentation for the wire transfers to BAUTISTA's bank in Singapore.[9] Lastly, in an email account lawfully searched during this investigation, law enforcement discovered a ledger of payments containing the first name of Co-Conspirator 3, who was the same individual

---

[9] HSI also located a second Excel spreadsheet in Vendor-Employee's email from December 2016 that detailed the "Extra Fee" for purchase order #5134 and subsequent payments from the "Extra Fee" to Baumann, Philippine Metal Company, and to the organization referenced in Footnote 7.

who signed and executed Contracts 1, 2, and 3 with COMELEC on behalf of Company 4. This ledger contained most of the redirected payments that I have determined were paid to BAUTISTA.

*On or about August 23, 2016, Baumann had wired $960,000 to the United States to Purchase a Residence*

66.     In reviewing emails and bank records obtained during the investigation, as noted above, I have learned that the Co-Conspirators attempted to send $500,000 on August 16, 2016, from Shell Company Y to BAUTISTA's Baumann bank account in Singapore. BAUTISTA, on or about August 18, 2016, emailed "D.L." to inform her about the incoming wire to his account. D.L. was BAUTISTA's relationship manager at the Singapore bank and was identified as a point of contact on the wire transfer instructions referenced above. BAUTISTA attached the same documents about the wire transfer that included the name of D.L. and that the justification for the transfer was "LOAN AGREEMENT 2016," the same description on wire instructions found on Co-Conspirator 2's laptop.

67.     Based on the documents and communications reviewed by law enforcement, BAUTISTA knew at least as early as August 8, 2016, that he would receive funds from the Co-Conspirators. On or about August 8, 2016, BAUTISTA emailed "I.S.," who was his assistant, a Microsoft Word document that had the file name "LOAN AGREEMENT PERSONAL." The email had been forwarded to BAUTISTA and the subject line read "Fw: Draft contract," which indicates that someone had forwarded BAUTISTA this email. However, in the email he forwarded to I.S., BAUTISTA deleted the original sender from the email to I.S. The Microsoft Word document in the email was a draft loan contract between Baumann and Shell Company X. According to the metadata for this Word document, Co-Conspirator 1 created this draft loan contract on or about August 3, 2016. Law enforcement found this same draft loan contract on Co-Conspirator 2's laptop.

68.     On or about August 23, 2016, the day after the Co-Conspirators attempted to wire the second $500,000 amount (which later did not go through), $960,000 was wired out of the Baumann account (BAUTISTA's account) to a bank account in New York held in the name of a BAUTISTA family member (Family Member 1).[10]  According to bank records, the payment details for this wire transfer described it as a "Gift."  On or about August 29, 2016, this exact amount—$960,000—was wired out by Family Member 1 of this New York-based bank account to an escrow account for a partial payment for a residence in San Francisco, California that cost $1,279,200.  Family Member 1 purchased the residence on August 31, 2016, and was listed as the only purchaser of the residence.

69.     Email communications from July 2016 between BAUTISTA and family members stressed the importance of wiring the funds from the bank account in Singapore directly to Family Member 1, not to the company in charge of the closing for the residence, and to label the wire as a "gift."  In another email, Family Member 1 thanked BAUTISTA for the "most generous gift you've given me this year for my birthday – the opportunity to partner with you on this very large investment."  In a later email that copied BAUTISTA, a family member recommended a real estate agent to use if they ever decided to sell the residence.  Based on my training and experience and involvement in this investigation, I believe that the $960,000 wire transfer for the residence was not a gift, but a joint real estate investment between BAUTISTA and Family Member 1.

---

[10]  According to bank records for Baumann, the account had a negative balance after the $960,000 was sent to Family Member 1.  The evidence suggests that this occurred because based on the conversations described above, BAUTISTA thought that the first two $500,000 wires sent on August 16, 2016, and August 22, 2016, would be credited to his account.  I know this because BAUTISTA forwarded the draft loan agreement to I.S., his assistant, on or about August 8, 2016, and the first wire confirmation to D.L., his relationship manager at the bank on or about August 18, 2016.  After the Co-Conspirators and Vendor A-President resent the two transfers for approximately $500,000 each in late August 2016, the Baumann bank account flipped to a positive balance.

## CONCLUSION

70.     Based on the foregoing, your Affiant submits there is probable cause to issue a

criminal complaint and arrest warrant charging Juan Andres "Andy" Donato Bautista with

conspiring to launder monetary instruments and conspiring to engage in monetary transactions in

property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(2)(A),

1956(a)(2)(B)(i), and 1957(a); all in violation of 18 U.S.C. § 1956(h); and laundering and

attempted laundering of monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and

1956(a)(2)(B)(i).

FURTHER YOUR AFFIANT SAYETH NAUGHT.


Respectfully submitted,

COLBERD ALMEIDA
Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1
by Face Time this ___19___ day of September 2023.


_____
HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE

