UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CR-20343-KMW

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ROGER ALEJANDRO PIÑATE MARTINEZ,

    Defendant.

_____/

## **DEFENDANT ROGER PIÑATE'S MOTION FOR A BILL OF PARTICULARS**

The government has charged Defendant Roger Piñate with violating the Foreign Corrupt Practices Act ("FCPA") and the money laundering statutes. But the Indictment, while long on story, is short on several key facts needed to inform Mr. Piñate of *how* he is alleged to have violated these statutes. Accordingly, Mr. Piñate moves for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).

Specifically, Mr. Piñate requests that the government particularize its allegations by (1) identifying the official acts, decisions, omissions in violation of lawful duties, or uses of influence that were undertaken by a foreign official in consideration for a corrupt act, and how those allegedly corrupt acts were intended to assist in "obtaining or retaining business for or with, or directing business to, any person," as required by the FCPA; and (2) identifying the specific transactions that underlie the alleged money laundering conspiracy. As it stands, the Indictment—as well as the discovery provided by the government—fails to sufficiently set forth these facts, and prejudices Mr. Piñate's ability to prepare for trial.

## FACTUAL BACKGROUND

Mr. Piñate is an engineer who develops election management systems in mature and emerging democracies around the world. The Indictment charges Mr. Piñate with conspiratorial and substantive violations of the FCPA and money laundering statutes in connection with the Philippines' 2016 national elections. (ECF No. 1.) Count 1 charges Mr. Piñate and co-defendant Jorge Vasquez with conspiracy to violate the FCPA (18 U.S.C. § 371); Count 2 charges Mr. Piñate and Mr. Vasquez with a substantive FCPA violation (15 U.S.C. § 78dd-2); Count 3 charges a money laundering conspiracy against Mr. Piñate, Mr. Vasquez, and the remaining co-defendants, Elie Moreno and Juan Bautista (18 U.S.C. § 1956(h)), with several underlying objects of the conspiracy; and Counts 4-6 charge all four defendants with substantive promotional money laundering (§ 1956(a)(2)(A)).

### The FCPA Charges

Broadly speaking, the Indictment alleges a scheme to bribe Mr. Bautista, the former chairman of the Philippine Commission on Elections ("COMELEC"), for the benefit of one or more (it is not clear which) of a laundry list of companies.

Count 1 alleges that the purpose of the bribery scheme was to "obtain and retain contracts with, and receive payment—including releases of value added tax ("VAT") payments—from, COMELEC … and direct business to Company 1, Company 1 subsidiary, Company 2, Company 3, Vendor A, and others." (*Id.* at pp. 8-9, ¶ 3). It does not specify which particular contract(s), nor which of the many payments issued over a span of years in connection with various election-related contracts, are at issue.

2

Count 2's substantive charge alleges that Mr. Piñate messaged Mr. Vasquez and instructed him to execute a loan agreement to make improper payments to Mr. Bautista, also for the benefit of the same list of companies "and others." (*Id.* pp. 19-20, ¶ 2.)

The Indictment is rich in narrative. However, amid the lengthy cast of characters, it fails to allege the specific official acts, decisions, omissions, or uses of influence taken by a foreign official in relation to a corrupt payment. It also fails to set forth how any such acts were intended to improperly obtain payment from COMELEC, or assist in obtaining, retaining, or directing business on behalf of or to the several companies listed in the Indictment.

## The Money Laundering Charges

Count 3 of the Indictment alleges that all four defendants participated in a money laundering conspiracy with three objects: 1) concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); 2) promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A); and 3) illicit monetary transactions, in violation of 18 U.S.C. § 1957. (*Id.* at pp. 20-21, ¶ 2(a)-(c).) But nowhere does the Indictment allege which transactions form the basis of the conspiracy. In contrast, the substantive money laundering charges in Counts 4-6 only allege violations of 18 U.S.C. § 1956(a)(2)(A)—promotional money laundering—and identify three transactions with specificity.

<u>Mr. Piñate's Request for Voluntary Particulars</u>

To fill these gaps and obtain other necessary information for trial, Mr. Piñate's counsel asked the government to supply particulars voluntarily. (*See* Exhibit A, Request for Particulars.) The government provided certain answers, including the identities of unnamed co-conspirators, corporate entities, and three Philippine criminal statutes that it contends were violated. (*See* Exhibit A, Response to Request for Particulars.)[1] However, with respect to the official acts, decisions, omissions, and uses of influence that were allegedly corrupted (or intended to be), the government stated that the Indictment is "sufficiently detailed to provide the information requested." (*Id.* at Request No. 4.) It offered the same reply to Mr. Piñate's request for the specific transactions that form the basis of Count 3. (*Id.* at Request No. 5.)

To obtain this limited—yet necessary—information, this Motion now follows.

## **LEGAL STANDARD**

Where an indictment fails to provide the accused with notice of the essential facts of a charged offense, a court may order the government to file a bill of particulars. *See* Fed. R. Crim. P. 7(f). The purpose of such a bill is "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986).

---

[1] The government's correspondence in Exhibit B has been redacted so as not to publicly deanonymize the Indictment.

4

Accordingly, a request for a bill of particulars should be granted where "the information requested is necessary to allow the defense to prepare its case adequately or to avoid prejudicial surprise." 1 Charles Alan Wright & Andrew D. Leipold, Fed. Prac. & Proc. § 130 (4th ed. 2008); *see also United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985) ("[W]here an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request for a bill of particulars may constitute reversible error.") (citation omitted).

## ARGUMENT

### A. A Bill of Particulars Is Necessary to Identify the Improper Official Acts, Omissions, or Uses of Influence Taken in Response to a Corrupt Act.

The Indictment fails to sufficiently identify what improper official acts, omissions, or uses of influence were taken or intended in connection with alleged corrupt payments to a Philippine official. To enable Mr. Piñate to prepare for trial and make appropriate legal challenges, the government should be compelled to identify these acts with more precision.

To establish a violation of the FCPA, the government must prove that a defendant engaged in a corrupt act for the purpose of:

> (i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist . . . in obtaining or retaining business for or with, or directing business to, any person.

5

15 U.S.C. § 78dd-2(a).

An indictment must, then, allege these essential elements, including "the sought-after ***unlawful actions*** taken or not taken by the foreign official in consideration of the bribes[.]" *United States v. Kay*, 359 F.3d 738 at 760 (5th Cir. 2004) (emphasis added). Here, the Indictment identifies the *purpose* of the alleged conspiracy—"to obtain and retain contracts with, and receive payment[,] including releases of value added tax ("VAT") payments[,] from COMELEC"—but it does not allege what (if any) *unlawful actions* were sought by any corrupt acts of Mr. Piñate (or any other co-conspirator). Instead, the Indictment takes the existence of undisputed events (the awarding of contracts and payment) and assumes these facts establish a corrupt intent to influence some (unknown) official act. The government should be required to fill in these blanks and confirm whether the contracts and payments (the objects of the conspiracy) are *also* the official unlawful actions sought by Mr. Piñate and, if so, indicate how such official acts were allegedly corrupted. And if there are *additional* Philippine governmental actions that the government claims were corrupted, Mr. Piñate has a right to know so he can investigate properly and prepare his defense.

For example, the Indictment alleges that COMELEC, with Mr. Bautista as chairman, awarded three contracts on August 1, 2015, August 27, 2015, and December 8, 2015, respectively. (ECF No. 1 at p. 5, ¶ 19; p. 6., ¶¶ 21-22.)  But there is no allegation that any communication took place between Mr. Bautista and Mr. Piñate (or any other co-defendant) *before* COMELEC awarded the contracts, let alone

6

a communication suggestive of a bribe. In fact, the Indictment's first ***and only*** alleged communication between Mr. Bautista and *any* co-defendant took place on July 19, 2016, over six months *after* the contracts had been awarded. (ECF No. 1 at p. 13, ¶ 11.) And the first overt act inferentially linked to the alleged bribe did not happen until March 31, 2016, over three months *after* the last contract was awarded. (*Id.* at p. 11, ¶ 3.) To the extent the government intends to rely on the award of one or more contracts as an official act, it should be compelled to say so explicitly, and identify the essential facts demonstrating how this decision was corruptly sought or influenced.

As for the issuance of payment and VAT releases, the Indictment similarly fails to set forth an act or decision on Mr. Bautista's part made in response to some also unidentified corrupt overture. On July 29, 2016, the Indictment alleges that Mr. Moreno sent an official letter to Mr. Bautista/COMELEC asking for the release of outstanding collectibles, "inclusive of 12% VAT[.]" (*Id.* at p. 13, ¶ 11.) Such a request is in keeping with the terms of the contracts, which provided for installment payments after meeting certain milestones. (*Id.* at pp. 5-6, ¶¶ 19, 21-22.) Sometime in early August 2016, Mr. Bautista is alleged to have approved a payment, which included a portion of VAT withheld under the second contract. (*Id.* at p. 14, ¶ 17.) While there are allegations that plans for improper payments to Mr. Bautista were taking place in the background, *id.* at pp 13-14, ¶¶ 12-16, the Indictment does not allege that (1) any additional communications took place between Mr. Bautista and any co-defendant; (2) that Mr. Bautista knew of any improper payments; or (3) that he undertook any further acts or decisions. And, tellingly, nowhere does the

7

Indictment allege that these payments released were not earned. To place Mr. Piñate on notice of the essential facts, namely, improper official undertakings, the government should be required to confirm whether payments and VAT releases are official acts, and what Mr. Piñate allegedly did to corruptly seek their issuance.

Similarly, as dictated by *Kay*, the government should be compelled to identify whether any *other* acts on the part of Bautista or COMELEC are alleged to have been corrupted. The Indictment alleges that three COMELEC contracts, taken together, were worth approximately $182 million. (*See* ECF No. 1 at p. 6, ¶ 23.) After meeting the appropriate milestones, numerous payments were made under those contractual terms. Given the Indictment's broad allegation that the purpose of the bribery scheme was to "obtain and retain contracts with, and receive payment," as well as "directing business to" a long list of anonymized companies (*Id.* at pp. 8-9, ¶ 3), the government should be required to specifically identify *all decisions and payments* that it contends constitute improper official acts by Mr. Bautista (or other Philippine public officials).

Finally, as to the many companies or "others" noted but not listed in the Indictment, the government should be required to identify which company obtained or retained business or to which business was directed given the broad allegations spanning contracts awards and payments over a course of years.

Such information is critical to Mr. Piñate's defense. Mr. Piñate is charged with alleged crimes that occurred half a world away and more than eight years ago. To prepare a defense—including the understanding of terabytes of data, issuance of compulsory process, and proper confrontation of witnesses—Mr. Piñate deserves to

8

have a succinct understanding of the actual process he is alleged to have corrupted. A bill of particulars that identifies the official acts in question will not significantly burden the government, but it *will* ensure that Mr. Piñate knows the contours of the alleged bribery scheme.

Courts routinely order the government to prepare bills of particulars in cases involving bribes.[2] This is both to ensure adequate notice but also to safeguard against prosecutions that reach beyond what is permitted under constitutional principles and the statutory text. *See generally McDonnell v. United States,* 579 U.S. 550 (2016) (expressing concern about criminalization of political interactions). Two cases serve as exemplars. In *United States v. Bazezew*, 783 F. Supp. 2d 160, 168–69 (D.D.C. 2011), the court held that "the defendants will not be able to adequately prepare for trial or avoid surprise at trial if they are not provided a bill of particulars" setting out "a

---

[2] *See, e.g.*, *United States v. Carson*, Mins. of Mot. Hr'g at 3–4, No. 8:09-cr-77 (C.D. Cal. May 18, 2009), ECF No. 75 (ordering bill of particulars detailing the date of payment, amount of payment, and "the name of the recipient and business affiliation of the recipient, or if the recipient is an intermediary, the business affiliation of the individual who was intended to benefit from the payment" with respect to "each of the 236 alleged bribes not described in the Indictment") (FCPA and Travel Act case). *United States v. Nguyen*, Order, No. 2:08-cr-522 (E.D. Pa. Dec. 3, 2009), ECF No. 130 (granting motion for bill of particulars in FCPA conspiracy case and ordering the government to "disclose the name, job title and employer of each person it contends was the recipient or intended recipient of each bribe alleged in the superseding indictment."); *United States v. Lino*, No. 00 CR 632 (WHP), 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (in case where defendant was "charged with multiple counts of paying or agreeing to pay bribes to pension fund officials," ordering a bill of particulars disclosing "whom [the defendant] agreed to bribe, the pension fund with which the bribe recipient was affiliated, and the amount of the bribe"); *United States v. Murgio,* 209 F. Supp. 3d 698, 723 (S.D.N.Y. 2016) (ordering the government to "identify the dates, locations, and amounts of any bribes that [the defendant] in particular paid to [the chairman of the board of a federal credit union]").

9

description of any overt act taken" by the defendants in furtherance of the alleged bribery conspiracy. And in *United States v. Mitziga*, No. 23-CR-242, 2024 WL 383670, at *6 (N.D. Ill. Feb. 1. 2024), the government was ordered to provide a bill of particulars as to the official acts the defendant was alleged to have procured, noting that "advance disclosure of this information is important . . . to permit the defendants to prepare for trial." This relief was also warranted to clarify whether the government was attempting to establish guilt based on a suspect statutory scheme—namely payments to public officials made after the official had already taken action. *Id.*[3]

Mr. Piñate should similarly be afforded the opportunity to know what unlawful official acts he stands accused of seeking to corrupt in this case's alleged bribery scheme. After all, the "core of criminality" of the FCPA is the "bribery of a foreign official to induce him to perform an official duty in a corrupt manner[,]" *Kay*, 359 F.3d at 761. Because the Indictment does not sufficiently identify which (if any) official acts were induced corruptly, the Court should order the government to file a limited bill of particulars identifying these essential facts.

**B.   A Bill of Particulars Is Necessary to Identify How the Alleged Corrupt Acts Were Intended to Obtain Payments, Including VAT.**

An essential element of the FCPA is its requirement that a defendant act corruptly with the intent to obtain or retain business or to direct business. Insofar as

---

[3] At the time of the prosecution in *Mitziga,* the Supreme Court had granted *certiorari* to review *United States v. Snyder*, 71 F.4th 575 (7th Cir. 2023). The Supreme Court ultimately reversed the Seventh Circuit and vacated the conviction in that matter, citing an overbroad reading of the federal programs bribery statute. *See Snyder v. United States*, No. 23-108 (June 26, 2024).

10

the Indictment alleges that payments made on one or more contracts during the relevant time period constitute improper official acts, including the August 2016 VAT release, the government should be required to specify how Mr. Piñate corruptly intended for any such payment to assist in obtaining or retaining or directing business.

The FCPA is not without limits, and "[n]one contends that that FCPA criminalizes every payment to a foreign official." *Kay*, 359 F.3d at 743. As noted above, the FCPA prohibits "only those payments that are intended to (1) influence a foreign official to act or make a decision in his official capacity, or (2) induce such an official to perform or refrain from performing some act in violation of his duty, or (3) secure some wrongful advantage[.]" *Id.* And even then, the FCPA only prohibits payments if the "*quid pro quo* [] will *assist* (or is intended to assist) the payor in efforts get or keep some *business*." *Id.* (emphasis in original). In other words, there must be some "business nexus element" linking a bribe—the *quid*—to the intended conduct of foreign official—the *quo*—"to produce an anticipated result … that would assist (or is meant to assist) in obtaining or retaining business[.]" *Id.*; *see also United States v. Ng Lap Seng*, 934 F.3d 110, 132 (2d Cir. 2019) ("The FCPA further requires that each of these *quos* serves a particular purpose, *i.e.*, to assist the giver in "obtaining," "retaining," or "directing" business.").

With respect to the contracts, there simply is no *quid* alleged to have occurred *before* the *quo*. Indeed, the Indictment's "overt acts" section identifies only two earlier events: two messages from Mr. Piñate to Mr. Vazquez that expressed frustration over

11

COMELEC's bidding process but, notably, did not propose any course of conduct, let alone a bribe. (ECF No. 1 at p. 11, ¶¶ 1-2.) As for the remaining overt acts, all occurred in 2016 or later, well *after* the last contract was awarded in December 2015. And there is no indication that the alleged bribery resulted in *additional* contracts or any other election-related business.

As for the VAT release, the Indictment does not sufficiently allege how any alleged *quid* could assist in obtaining, retaining or directing business, i.e., it is silent as to the required business nexus element. As noted above, each of the three contracts called for payment to occur after certain milestones were met; nowhere does the Indictment allege that those milestones were not achieved or that the requested payments were not owed. Further, the Indictment does not indicate how the bribery scheme—which is not alleged to have been communicated to Mr. Bautista, directly or indirectly—could have been intended to secure the release of the VAT payments. And the Indictment is silent with respect to any factual recitation of how the VAT release could have been intended to obtain or retain or direct any business. In other words, the Indictment alleges no facts that show a connection between one instance of reduced tax liability and the attainment or retention of any other business opportunity.

In *Kay*, the Fifth Circuit confronted a similar scenario. There, the government brought FCPA violations in connection with payments to Haitian officials to avoid certain customs duties and sales taxes. Although the district court had initially dismissed the indictment, concluding the payments were not the kinds of bribes that

12

the FCPA criminalized, the Fifth Circuit reversed. However, it cautioned that the indictment did not recite any particularized facts alleging "the nexus between the illicit tax savings produced by the bribery and the assistance such savings provided or were intended to provide in *obtaining or retain business* for" the named companies. *Kay*, 359 F.3d at 741 (emphasis in original). While these omissions did not render the indictment infirm, *see id.* at 760-761, the court gave the defendants the option to seek a bill of particulars. *Id.* at 740 (permitting on remand a motion "to compel the government to allege more specific facts regarding the intent element of a FCPA crime."). And in *Kay*, the government voluntarily provided a bill of particulars less than ten days after the Fifth Circuit's mandate issued.

Given that the Indictment here similarly fails to allege how the VAT release was corruptly obtained or how its release could have assisted in obtaining any business, the Court should compel the government to recite such facts in a bill of particulars.

### C. The Government Should Be Compelled to Identify the Transactions Underlying the Alleged Money Laundering Conspiracy.

In Count 3, the government charges all four co-defendants with conspiring to commit money laundering in the service of three objects: concealment, promotional, and financial transaction money laundering. (*See* ECF No. 1 at p. 20-21, ¶ 2(a)-(c).) However, Count 3 does not identify what monetary transactions were taken or attempted in connection with the conspiracy. It simply incorporates the Indictment's general allegations which, in turn, reference an overwhelming volume of financial

13

transactions. For Mr. Piñate to prepare for trial, the government should be required to identify Count 3's offending transactions with more specificity.

The universe of potential monetary transactions—completed or attempted—from which the government may draw its evidence is staggering. The "General Allegations" and "Manner and Means" allegations incorporated by reference in Count 3 open the door to: allegedly over-invoicing the cost of 71,000 individual voting machines; the transfer of alleged "slush funds" through banks in Hong Kong, Singapore, the Philippines, Switzerland, and the U.S.; and globe-spanning wire transfers involving a "network of offshore and domestic bank accounts, intermediaries, and shell and front companies." (*Id.* at pp. 9-10, ¶¶ 5-8.) The discovery, measured in terabytes of data, is just as expansive. From the records reviewed to date, there are thousands of pages of bank records for dozens of accounts documenting many more thousands of financial transactions, the relevance of which is unclear in most instances.

The government has provided Mr. Piñate with two suggested methods of making sense of this information, both of which are inadequate. First, the government has pointed to Counts 1 and 4 through 6 as exemplars of the underlying money laundering transactions. (*See* Exhibit B at Response to Request No. 5.) If the three transactions in Counts 4 through 6 are the basis for the conspiracy, the government should say so. But if they are not—which government's reference to Count 1 suggests—then the government should simply tell the defendants what the

14

scope and nature of the purported money laundering conspiracy is. Mr. Piñate should not be left guessing as to the extent of the alleged conspiracy.

Second, the government has directed Mr. Piñate to the Complaint filed in a related case against Mr. Bautista, (*see id.* at n.1), but this too is unhelpful. For instance, the Complaint references multiple transactions that occurred in 2017, but well *after* the three transactions identified in Counts 4-6. (*See United States v. Bautista*, Case No. 23-mj-03829, ECF No. 1 at ¶ 65.)[4] The Complaint also references a host of transactions made in connection with alleged "slush funds," (*see id.* at ¶¶ 46-48)), but these transactions all predate the core period of the alleged conspiracy. Again, such information fails to apprise Mr. Piñate of the scope of the conspiracy with which he is charged.

Although a bill of particulars cannot compel the government to reveal how it will prove its case, a deluge of discovery cannot substitute for a basic identification of the essential facts. *See, e.g.*, *United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (discovery "may not be automatically relied on by the Government as an adequate substitute for a straightforward identification in a bill of particulars of the identity of victims of offense that the prosecuting intends to prove."); *United States v. Bortnovsky*, 820 F.2d 572, 757 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel[.]"); *accord United States v. Vasquez-Ruiz*, 136 F.Supp.2d 941, 944 (N.D. Ill. 2001) ("There is no good reason to require the defendant to engage in guesswork to determine who the

---

[4] There are two sequential paragraphs numbered "65" in the Complaint.

victims of an offense were, what bill the government will claim were false, and what tests it will claim were unnecessary.").

To spare Mr. Piñate from having to guess which transactions underlie the alleged money laundering conspiracy, and so prejudice his ability to prepare for trial and ward off surprise, the government should be compelled to identify the transactions in a bill of particulars.

## CONCLUSION

The Court should order the Government to particularize the Indictment by identifying: (1) the official acts, decisions, omissions, or uses of influence that were undertaken by a foreign official in consideration for a corrupt act, and how the release of VAT payments was intended to assist in obtaining or retaining business; and (2) the monetary transactions that underlie the money laundering conspiracy charge.

Such information is necessary for Mr. Piñate to understand the scope of the pending charges and to prepare effectively for trial.

Dated: October 8, 2024.

                        Respectfully submitted,

                        COLSON HICKS EIDSON, P.A.
                        255 Alhambra Circle, Penthouse
                        Coral Gables, Florida 33134
                        Tel: (305) 476-7400

                        By:   /s/ *Curtis Miner*
                             Curtis Miner, Esq.
                             (Florida Bar No. 885681)
                             E-mail: curt@colson.com
                             Thomas A. Kroeger, Esq.
                             (Florida Bar No. 19303)
                             E-mail: tom@colson.com

*And*

MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Tel: 202-739-5932
Sandra L. Moser, Esq. (*pro hac vice*)
E-mail: Sandra.moser@morganlewis.com
Justin D. Weitz, Esq. (*pro hac vice*)
E-mail: Justin.weitz@morganlewis.com

*Counsel for Defendant Roger Alejandro Piñate Martinez*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent an e-mail notification of such filing to all CM/ECF participants in this case on October 8, 2024.

By: ___/s/ *Curtis Miner*_____
      Curtis Miner, Esq.