UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CR-20343-KMW/Goodman

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

ROGER ALEJANDRO PIÑATE MARTINEZ,

      Defendant.

_____/

## **DEFENDANT ROGER PIÑATE'S MOTION TO DISMISS INDICTMENT**

"Federal and state law distinguish between two kinds of payments to public officials—bribes and gratuities. As a general matter, bribes are payments made or agreed to before an official act in order to influence the official with respect to that future official act." *Snyder v. United States*, 603 U.S. 1, 5 (2024).  In other words, while a bribe is paid before an official action, a gratuity is paid afterwards.  In *Snyder*, the Supreme Court did not tread new ground; it merely emphasized a core principle of its jurisprudence surrounding criminal corruption enforcement: that allegations of bribery require proof of "a quid pro quo," and are legally distinguishable from gratuities. *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999).

The indictment in this case charges the defendants with violations of 1) the Foreign Corrupt Practices Act (FCPA); and 2) money laundering statutes whose predicate offenses are the FCPA and Philippine laws barring "bribery of a public official," 18 U.S.C. § 1956(c)(7)(B)(iv).  But in doing so, the government has conflated an alleged gratuities scheme with the legally distinct crime of bribery which requires there be a *quid* offered or provided before the *quo*.  The indictment alleges payments that occurred *after* the official actions in question, not bribes paid to induce or

1

secure such actions.  Because neither the FCPA nor the money laundering statutes criminalizes the payment of gratuities, the indictment is legally deficient.

Mr. Piñate believes that this is an issue of first impression in the wake of the Supreme Court's decision in *Snyder*.  But the direction that courts are likely to follow is clear.  The Supreme Court has loudly and consistently pronounced its skepticism of the government's "boundless interpretation" of aggressive corruption prosecutions, *McDonnell v. United States*, 579 U.S. 550, 581 (2016), and Mr. Piñate requests that this Court heed the Supreme Court's plain pronouncements.  The indictment in this case charges a gratuities scheme, and the government has proffered no evidence that this case involves a *quid pro quo*.  Because, as a matter of law, this is not a *bribery* case, but something beyond the reach of the implicated statutes, this Court should dismiss the indictment.

## FACTUAL BACKGROUND

Although the indictment is long, the facts relevant to this motion are short.  In sum and substance, the indictment alleges that, beginning in late August 2016 and continuing through early 2017, Mr. Piñate and his alleged co-conspirators directed or attempted to direct illicit payments to Andy Bautista, a co-defendant who served as the chair of the Philippine Commission on Elections (COMELEC) beginning in April 2015.  The indictment alleges that these payments were somehow connected both to: obtaining COMELEC contracts related to the May 2016 Philippine national elections, all of which were awarded well *before* the payments; and receiving improperly withheld taxes, which were declared due and owing by the Filipino tax authority, also *before* any alleged illicit payments.

In other words, whatever the government believes Mr. Bautista may have done in connection with these alleged attempted payments—facts nowhere to be found in the 24-page

indictment[1]—necessarily happened *before* the payments in question.  Again, COMELEC awarded the contracts for the 2016 elections in 2015 (Indictment p.6 at 21-22), well before any of the payments referenced in the indictment, which allegedly took place in August 2016 or after (*id.* at pp. 15-18).  And while the indictment fails to explain the nature of *any* illegal agreement, it most certainly does not point to any evidence to suggest that COMELEC's decisions to award the contracts in 2015 were influenced by a promise to pay Bautista later.  Indeed, the elections themselves had concluded months before the first alleged payment to Bautista in August 2016.

Even accepting the premise (for purposes of this motion alone) that Bautista somehow acted corruptly to influence the award of the contracts by the seven member *en banc* Commission, the indictment's timeline is clear.  The contracts were awarded in 2015, the tax opinion was released in April 2016, and the election itself was concluded in May 2016.  But any purported payments to Bautista were initiated, at best, in August 2016.  That timeline is critical given the temporal distinctions noted by the Supreme Court on multiple occasions in its public corruption jurisprudence.

## **LEGAL STANDARD**

An indictment must contain the elements of the offense charged and fairly inform a defendant of the charge against him and allow him to plead acquittal or conviction to bar future prosecution on the same offense.  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself," but only "as long as those words of themselves fully, directly, and expressly, without any uncertainty

---

[1] Despite being the linchpin of what the FCPA requires, the indictment includes no factual allegation evidencing any agreement by Mr. Bautista to be influenced in his official actions, be induced to do or not do acts in violation of his duties, or provide an identifiable advantage to the defendants.

or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *Id*. (citations omitted).

"Even when an indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *United States v. Schmitz*, 634 F.3d 1247, 1261 (11th Cir. 2011) (cleaned up). Thus, in determining an indictment's sufficiency, the Court reads the indictment "as a whole and give[s] it a 'common sense construction,'" which means that "the indictment's validity is to be determined by practical, not technical considerations." *Id*. at 1259-60.

However, there are times when tracking the statutory language is insufficient, and this is one such time. "When one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (citations omitted). Indeed, "[i]f courts have added a significant refinement in the interpretation of a particular statutory element, that element often must be pleaded as interpreted rather than as stated in the statutory language, especially if the judicial interpretation substantially limits the scope of the statutory language." WAYNE LAFAVE, et al., 5 CRIM. PROC. § 19.3(b) (4th ed.) (2021).

## ARGUMENT

I.   *Bribes and Gratuities are Legally Distinct Offenses.*

For decades, the Supreme Court has differentiated between bribes and gratuities. "[F]or bribery there must be a *quid pro quo*–a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward

4

for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Sun Diamond*, 526 U.S. at 404-05. At the heart of a bribe is its timing: it takes place before an official action, in order to induce it, as opposed to after, to reward it.

Indeed, timing is the key criterion in distinguishing bribes from gratuities. According to the Supreme Court, "gratuities are typically payments made to an official *after* an official act as a token of appreciation." *Snyder*, 603 U.S. at 5 (emphasis in original). The *Snyder* Court noted that "gratuities after the official act are not the same as bribes before the official act." *Id*. at 6. Accordingly, "[a]lthough a gratuity offered and accepted after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate §666." *Id*. at 19. Indeed, all nine justices agree with this basic principle; even the dissent in *Snyder* acknowledged that gratuities are "paid to corrupt officials after the fact." *Id*. at 25 (Jackson, J., dissenting).

This is true across statutory schemes. Each federal criminal statute defines the "*quo*" in its own way. Section 201, the general anti-bribery statute for federal officials, requires that the bribe be paid to influence "an official act." 18 U.S.C. § 201(b)(1)(A). Section 666, which covers state and local officials, requires that it be "in connection … with business" of a covered jurisdiction. 18 U.S.C. § 666(a)(1)(B). And the FCPA requires that a *quid* be given "to obtain or retain business" or secure an improper advantage. 15 U.S.C. § 78dd(a)(1). These differences in what constitutes a *quo* notwithstanding, one thing is clear: under federal criminal law, a bribe requires a corrupt exchange of *quid* for *quo*, and corrupt payments without a *quid pro quo*, including those made after the fact, are gratuities.

In *Snyder*, the Supreme Court resolved a circuit split in interpreting 18 U.S.C. § 666, a federal statute which criminalizes bribery of state and local officials. The Supreme Court was

5

asked to determine whether Section 666, which made it illegal to offer a thing of value "to influence or reward" a public official, encompassed gratuities as well as bribes.  The Supreme Court ruled that it did not.  Justice Kavanaugh began the Court's opinion with a succinct statement of the law:

> Federal and state law distinguish between two kinds of payments to public officials—bribes and gratuities. As a general matter, bribes are payments made or agreed to before an official act in order to influence the official with respect to that future official act. American law generally treats bribes as inherently corrupt and unlawful. But the law's treatment of gratuities is more nuanced.

*Snyder*, 603 U.S. at 5.

The reason for this distinction is crucial.  Federal criminal law penalizes *quid pro quo* schemes because they corrupt the political or procurement process.  But gratuities do no such thing, because they cannot influence an official act that has already taken place.  Gratuities are akin to ethics violations, and the Supreme Court has found that for gratuities to be criminalized, Congress must expressly do so.

The difference between bribes and gratuities sounds solely in timing and *quid pro quo*.  The indictment alleges hundreds of thousands of dollars in alleged payments to Mr. Bautista, but it is not the amount of the payment that determines whether something is a bribe or a gratuity.  Rather, it is the intent surrounding the payments, and whether the intent was to influence a *future* official action, as opposed to rewarding or thanking a public official for taking action in the past.

II.      *The FCPA does not prohibit gratuities.*

Congress enacted the FCPA in 1977 to combat bribery of foreign officials by U.S. persons and entities.  The FCPA, in relevant part, makes it a crime to corruptly provide a thing of value in order to influence an act or secure an improper advantage, in order to obtain or retain business.  15 U.S.C. § 78dd-2(a)(1).  The FCPA thus includes three core components: a *quid* ("anything of

value"), a *pro* ("corruptly . . . in order to influence"), and a *quo* (an act, an improper advantage, or the like, in order to obtain or retain business). The statute clearly and unequivocally bans bribery.

That clarity contrasts with the confusion the *Snyder* Court encountered in interpreting Section 666. The circuit split on whether Section 666 applied to gratuities as well as bribes arose because Congress defined the intent element in Section 666 to include instances where a public official "intend[ed] to be influenced or rewarded." The word "rewarded," which appeared to sound in gratuities inasmuch as it suggested a payment to a public official *after* an official action, led to decades of competing court decisions. *Snyder*, 603 U.S. at 5-7. But this statutory ambiguity is nowhere to be found in the FCPA, which, unlike Section 666, never contemplates the possibility of criminalizing mere "rewards."

In interpreting the FCPA, this Court should follow the *Snyder* Court's lead. The *Snyder* Court noted that "[s]ix reasons, taken together, lead us to conclude that § 666 is a bribery statute and not a gratuities statute—text, statutory history, statutory structure, statutory punishments, federalism, and fair notice." *Id*. at 10. In interpreting the FCPA, every piece of *Snyder*'s logic applies with equal force.

First, this Court should analyze the statutory text. This factor weighs in Mr. Piñate's favor. 18 U.S.C. § 201 contains an explicit gratuities provision alongside the more familiar criminalization of bribes, which indicates that Congress knows how to prohibit gratuities when it wishes to. The FCPA does not include any such provision. And the FCPA does not even include the ambiguous "rewarded" language found in Section 666, which, of course, the Supreme Court found insufficient to justify criminalizing gratuities in any event.

In some ways, this should be the end of the analysis. The Supreme Court has proclaimed repeatedly in recent years that statutory interpretation questions begin and end with the text of the

7

statute, because "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). Unlike in *Snyder*, where the subject statute could have plausibly banned gratuities because of the inclusion of the word "rewarded," there is no ambiguity here. Congress did not choose to ban gratuities in the FCPA.

Second, the *Snyder* Court pointed to statutory history. In *Snyder*, the Supreme Court noted that two years after enacting Section 666 and including a clear gratuities provision, Congress removed that provision. *Id*. at 12. The FCPA never contained a gratuities provision, so one was never removed. And Congress's amendments to the original statute have never added one. For example, Congress amended paragraph (a) of this statute in 1998 to include the "improper advantage" language. It could have chosen to add a gratuities provision then or later. Congress's decision not to do so supports Mr. Piñate's view that the statute does not encompass gratuities.

And Congress's more recent actions vis-à-vis foreign corruption laws confirm this view. In July 2024, after *Snyder* had been decided, the Foreign Extortion Prevention Act ("FEPA"), 18 U.S.C. § 1352, came into effect. FEPA, which had previously been codified elsewhere and had originally been enacted in late 2023, criminalizes "demands by foreign officials for bribes." FEPA, which is meant to parallel the FCPA, applies to those situations where a thing of value is demanded or accepted "in return for" some sort of official action. 18 U.S.C. § 1352(b)(1)(B). It does *not* criminalize gratuities, or the receipt of gratuity-like payments.

Congress could, of course, have chosen to criminalize gratuities in FEPA or the FCPA. But it did not. Instead, Congress required a *quid pro quo*. This recent action by Congress, made weeks after the Supreme Court decided *Snyder*, is a powerful indicator of Congress's intent not to extend the FCPA to gratuity payments.

Third, the *Snyder* Court examined statutory structure. *Id*. at 12-13. The Court rejected the government's contention that Congress meant to incorporate bribes and gratuities in a "single statutory provision." Noting that "[s]uch a statute would be highly unusual, if not unique," the Court further pointed out that the government could identify "no other provision in the U.S. Code that prohibits bribes and gratuities in the same provision."[2]

The government, of course, did not identify the FCPA as one such provision, because the FCPA does not ban gratuities. Just as "the absence of a separate gratuities provision in § 666 reinforces that § 666 is a bribery statute for state and local officials, not a two-for-one bribery-and-gratuities statute," *id*. at 13, the absence of a separate gratuities provision in the FCPA reinforces that it is a bribery statute, not a gratuities statute.

And the government's own interpretation of the FCPA reinforces that the FCPA is strictly a bribery statute. DOJ, in tandem with the SEC, has published the "FCPA Resource Guide," which provides guidance on how the government views the FCPA. The most recent issue, dated July 2020, repeatedly refers to the FCPA's "anti-bribery" provision, and includes 240 references to the word "bribery" (and many others to "bribes"). *See* https://www.justice.gov/criminal/criminal-fraud/file/1292051/dl?inline. The government clearly views the FCPA as a bribery statute, as evidenced by its position in *Snyder* and elsewhere.

Fourth, the *Snyder* Court pointed to the statutorily prescribed punishments for bribery and gratuities. "For federal officials, Congress has separated bribery and gratuities into two distinct provisions of §201 for good reason: The crimes receive different punishments that reflect their relative seriousness." *Snyder*, 603 U.S. at 13. The Court pointed out that bribery of federal

---

[2] The contrast, of course, is Section 201, which contains clear provisions banning both bribes and gratuities.

officials has a fifteen-year statutory maximum penalty, whereas gratuities has a maximum statutory penalty of two years in prison.  But Section 666 contained only one statutory maximum penalty – ten years' imprisonment – which indicated that Congress intended to punish only bribery.

Here, too, the FCPA prescribes only one statutory maximum penalty: five years' imprisonment.  15 USC § 78dd-2(g)(2)(A).  In this way, it parallels Section 201, and the *Snyder* Court's logic applies with equal force.  Penalizing bribes and gratuities equally would, in light of these "inexplicable anomalies," make no sense.  *Snyder*, 603 U.S. at 14.  As the Supreme Court put it, this "powerfully demonstrate[s] that §666 is a bribery statute."  *Id*.  The same holds true for the FCPA.

Fifth, the *Snyder* Court cited federalism.  The Supreme Court noted that the "carefully calibrated policy decisions that the States and local governments have made about gratuities would be gutted if we were to accept the Government's interpretation of §666."  *Id*.  Those policy decisions, the Court stated, are subject to significant deference because they apply to so many people – 19 million state and local officials, in addition to anyone who provides a gratuity – and because they emanate from entities that "define[] [themselves] as a sovereign through the structure of [their] government, and the character of those who exercise government authority."  *Id*. (citations omitted).

The *Snyder* Court's emphasis on state sovereignty is telling, because it indicates the Court's skepticism of prosecutorial approaches that distort the balance between separate sovereign entities. And just as states, in our constitutional system, are separate sovereigns, foreign nations are also, obviously, separate sovereigns. Indeed, *Snyder*'s federalism rationale is echoed by the principles of international comity for the federal government's relations with other sovereign entities. The Supreme Court "ordinarily construes ambiguous statutes to avoid unreasonable interference with

10

the sovereign authority of other nations." *F. Hoffman-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 156 (2004). The comity canon requires that, in interpreting statutes that have international implications, courts consider a foreign nation's sovereign interests.

And indeed, common sense supports this reading of the FCPA. Just as the *Snyder* Court cited the "nuanced [] policy judgments" of states and municipalities, every country in the world – and sub-national jurisdictions such as states, provinces, and cities in those countries – should be allowed to deal with gratuities as they see fit. The decision on how to address after-the-fact gratuities reflects local legal practice and customs in various countries, much in the same way that it reflects the unique character of each state and local jurisdiction contemplated in *Snyder*.

The Philippines may choose to proscribe or permit gratuities to public officials, and it may elect to set limitations on the nature and character of those payments. But that judgment belongs to the Philippines, not the United States. Reading the FCPA to prohibit gratuities exposes gift-givers *around the world* to U.S. corruption laws, no matter the nature of the local gratuities provisions and how they are enforced. That simply cannot be.

Finally, the Supreme Court cited "fair notice." Noting that Section 666 was, at best, unclear, the *Snyder* Court reasoned that the government's two potential approaches were both flawed. First, the government could state that all gratuities, regardless of size or character, were banned under Section 666, but such a "draconian approach would border on the absurd." *Snyder*, 603 U.S. at 15. Describing this approach as creating a "very serious real-world problem," Justice Kavanaugh noted "that the Government does not identify any remotely clear lines separating an innocuous or obviously benign gratuity from a criminal gratuity." *Id*. at 16. The second option, according to the *Snyder* Court, was that even with "unknown and unknowable" contours, to find that "federal prosecutors can be trusted" not to enforce a law unfairly. "But as this Court has said

11

time and again, the Court cannot construe a criminal statute on the assumption that the Government will use it responsibly." *Id*. at 17 (citing *McDonnell*, 579 U.S at 576).

That warning rings true here.  The FCPA is, at best, silent on whether it permits gratuities prosecutions.  The lines of what would constitute an illegal gratuity and what would not under the FCPA are impossible for a lawyer, let alone a layperson, to discern.  And that lack of "fair notice" requires constraining the FCPA and the government's aggressive and extratextual attempts to expand its scope.

Justice Gorsuch, who joined the majority opinion in full, framed this "fair notice" consideration as an application of the rule of lenity, which encourages courts, in interpreting criminal statutes, to lean in the defendant's favor.  Noting that "judges are bound by the ancient rule of lenity to decide the case as the Court does today," Justice Gorsuch stated that the majority was in fact applying the principles of lenity even if it chose not to say so explicitly.  *Snyder*, 603 U.S. at 20 (Gorsuch, J., concurring).  This Court should do the same here.

The Supreme Court has held for centuries that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971). Lenity follows logically from the principles of fair notice identified by the *Snyder* Court, especially in an area of law that is undeniably fraught and confusing.  Here, lenity commands a limited reading of the FCPA, whereby it applies only to bribes, and not to gratuities.

Such an approach is consistent with the Supreme Court's ongoing skepticism of governmental overreach in interpreting white-collar criminal statutes.  The government has been reproached, again and again, for its "boundless interpretation" of federal criminal statutes. *McDonnell*, 579 U.S. at 581.  Indeed, just last month, the Supreme Court rejected the government's expansive reading of 18 U.S.C. § 1014, *Thompson v. United States*, 604 U.S. __ (Mar. 21, 2025),

in line with its consistent view that federal criminal statutes are to be read cautiously. *See*, *e.g.*, *Skilling v. United States*, 561 U.S. 358 (2010); *Percoco v. United States*, 598 U.S. 319 (2023); *Ciminelli v. United States*, 598 U.S. 306 (2023); *Yates v. United States*, 574 U.S. 528 (2015); *Kelly v. United States*, 140 S. Ct. 1565 (2020). There are too many recent examples of the Supreme Court rejecting the government's aggressive interpretations of white-collar statutes (indeed, the list above is far from complete) to not notice a clear trend.

Justice Kavanaugh noted that "the Court has emphasized that a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Snyder*, 603 U.S. at 18 (citing *Sun Diamond*, 526 U.S. at 412). This Court should follow the Supreme Court's clear directions, and rule that the FCPA does not apply to gratuities. Accordingly, this should dismiss Counts One and Two, and the FCPA specified unlawful activity prong of the remaining counts of the indictment.

III.     *The indictment does not allege "bribery" against the laws of a foreign nation.*

The indictment also charges Mr. Piñate with four counts of money laundering related offenses, for which it alleges, as a specified unlawful activity (SUA), violations of Philippine bribery law. Section 1956(c)(7)(B)(iv) details that "an offense against a foreign nation involving bribery of a public official" is an SUA under the money laundering laws. But in interpreting the Philippine offenses in question, this Court must consider whether they constitute "bribery" under U.S. law.

There is a long precedent of such interpretations. For example, in *United States v. Nardello*, 393 U.S. 286, 295 (1969), the Supreme Court, in defining "extortion" under the Travel Act, 18 U.S.C. § 1952, ruled that "the inquiry is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged."

13

In *Taylor v. United States*, 495 U.S. 575, 590-92 (1990), the Supreme Court used a generic definition in defining "burglary." The Court should engage in a similar analysis here.

The government has informed Mr. Piñate's counsel that it intends to seek a conviction based on violations of three sections of the Philippine Penal Code: (1) Philippine Penal Code, Article 210 – Direct Bribery; (2) Philippine Penal Code, Article 211 – Indirect Bribery; and (3) Anti-Graft and Corrupt Practices – Republic Act No. 3019 – Section 3 (subsections (b) and (e)). *See* Ex. A (Philippine statutes).

These statutes read far more broadly than any U.S. bribery law, including the FCPA. None of the three (all of which apply primarily to public officials, in contrast to the FCPA, and are extended to payors by other sections) requires a *quid pro quo* or corrupt intent, which are the hallmarks of "bribery." In other words, they do not qualify as "bribery" under the *American* legal definition.

In federal criminal law, bribery requires the government to prove two core elements: 1) a *quid pro quo*; and 2) the existence of corrupt intent. These definitional limitations are logical and comport with the Supreme Court's public corruption jurisprudence. The mere fact that a public official receives a payment is not a crime, no matter how "distasteful" the payment may be. *McDonnell*, 579 U.S. at 580. Such payments are only criminal if they are made or received with corrupt intent.

Every federal bribery statute confirms this. The FCPA (15 U.S.C. § 78dd-2(a)) requires that any payment be made "corruptly." So do the federal program bribery statute (18 U.S.C. § 666(a)) and the overarching federal employee bribery statute (18 U.S.C. § 201(b)). There is no bribery statute involving public officials that does *not* require the government to prove corrupt

14

intent, and the government would never seriously consider instructing a jury that it could convict someone of bribery absent such intent.

But the Philippine statutes at issue here have no such *mens rea* requirement, nor do they require a *quid pro quo*, which ultimately means that they do not qualify as bribery under any American legal understanding.  Take, for example, Article 211, which reads: "The penalties of *prison correctional* in its medium and maximum periods, suspension and public censure shall be imposed upon any public officer who shall accept gifts offered to him by reason of his office." This statute lacks *any* mens rea or *quid pro quo* requirement.  This means that it is not a "bribery" offense as defined by American law in Section 1956, and it would be incorrect to define "bribery" in an American statute according to what the Philippines considers bribery.

Article 210 is similarly infirm, because it would also not meet any American legal definition of bribery.  This statute makes it illegal under Philippine law for a public officer to perform an act, "in connection with the performance of his official duties, in consideration of any offer, promise, gift or present received by such officer, personally or through the mediation of another . . ."  This statute, again, does not require a *quid pro quo*, and does not include any delineation of criminal intent.

And the Philippine Anti-Graft and Corrupt Practices law fares no better.  It penalizes "directly or indirectly requesting or receiving any gift, present, share, percentage, or benefit, for himself or for any other person, in connection with any contract or transaction between the Government and any other part, wherein the public officer in his official capacity has to intervene under the law."  Section 3019(3)(b).  The "in connection with" language is insufficient, because it neither requires a *quid pro quo* nor corrupt intent.

15

This Court is obligated to interpret Section 1956(c)(7), and to do so in a textually faithful manner. Such an interpretation requires that "bribery" means what it says – not gratuities, but bribes. And the Philippines' broad anti-graft laws do not neatly fit into the "bribery" paradigm that the Supreme Court has repeatedly emphasized, because they do not require a *quid pro quo* or corrupt intent.

Contrast these statutes with the Ecuadorian statutes that this Court addressed in *United States v. Polit,* Case No. 1:22-cr-20114-KMW (S.D. Fla.). There, the government asserted that the Ecuadorian penal code incorporated a requirement analogous to corrupt intent and requested jury instructions that incorporated this element. (Dkt Nos. 128-1 & 128-2.) And that was no surprise, because as all parties know, for a law to penalize bribery, it must require corrupt intent.

*United States v. Chi*, 936 F.3d 888 (9th Cir. 2019), provides a framework for this Court to utilize. In *Chi*, money laundering charges were predicated on violations of Article 129 of the South Korean Criminal Code. The Ninth Circuit agreed that the district court was required to determine that Article 129 "falls within the category of conduct of a bribery of a public official, as contemplated by Section 1956(c)." *Id*. at 892. The district court found that Article 129 did fall into that category, and the Ninth Circuit affirmed.

That this court must engage in such an analysis – whether the Philippine laws are true bribery statues under American law – is clear. In *Chi*, the Ninth Circuit used the Model Penal Code and the "ordinary, common, contemporary" meaning of bribery to determine that Article 129 qualified as bribery. *Id*. at 897. Noting that the jury "had to find that Chi acted in consideration of and in exchange for the money he received," *i.e.* a *quid pro quo*, Article 129 qualified as bribery. Indeed, the jury instruction even included the Latin term in its recitation of the elements. *Id*. at 892 n.6.

16

But the Philippine statutes here require no *quid pro quo*, nor do they require corrupt intent, and accordingly, are not bribery laws within the American meaning.  Even Article 210, whose "in consideration of" language is closest to the American conception of bribery, lacks the "in exchange" element – *i.e.* the *quid pro quo* requirement – that the *Chi* court found instrumental. None of these statutes constitutes bribery, because none requires a *quid pro quo*.

A more recent Ninth Circuit case interpreting the Travel Act provides additional guidance. In *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167 (2024), the Ninth Circuit conducted a similar analysis of the Travel Act and its reliance on state bribery statutes.  The Ninth Circuit found that that the underlying California bribery offenses used to convict a defendant were broader than those permitted by the generic definition of bribery.  *Id*. at 1184.  Despite this "mismatch," *id*. at 1185, the appeals court affirmed the conviction because:

> The Government charged[3] and the jury convicted Shen Zhen based on required findings of both a specific intent to enter a *quid pro quo* and to receive an official act—the elements of the generic definition of "bribery" proscribed by the Travel Act. Here, the jury instructions stated that the jury had to find that Shen Zhen "performed the charged act ... in violation of [the California statutes]." For each "charged act," the jury was required to find that Shen Zhen "provided [benefits] in exchange for Jose Huizar agreeing to perform official acts to benefit the redevelopment of the L.A. Grand Hotel." The jury's required findings specify the quid pro quo [] and the official acts [].

---

[3] Mr. Piñate respectfully requests that this Court review, *in camera*, the instructions provided to the grand jury regarding both the FCPA and Philippine statutes at issue.  In *United States v. Bravo Fernandez*, 239 F. Supp. 2d 411 (D.P.R. 2017), the district court reviewed grand jury instructions *in camera* in an analogous situation.  The First Circuit, in a precursor case to *Snyder*, had ruled that Section 666 applied only to gratuities, and not to bribes.  Noting that the government may have, in good faith, mis-instructed the jury by failing to show the requirement of a *quid pro quo*, the district court found that the defendant had demonstrated "particularized need" – not to receive the instructions, but for *in camera* review.  *Id*. at 416-17.  Unless the government concedes that these statutes require a *quid pro quo* (and so instructed the grand jury), this situation resembles that in *Bravo Fernandez*.

*Id.* In other words, the defendant's conviction was affirmed because the district court had adopted his proposed instruction and charged the jury that it was required to find a *quid pro quo* and specific, corrupt intent.

The jurisprudence on bribery has evolved in recent years, but it is apparent that merely calling something a "bribery" law does not make it so in the U.S. Allowing a conviction on the basis of these Philippine statutes would undermine the plain statutory text of Section 1956, which applies only to *bribery* offenses against the laws of foreign nations. While bribery requires a *quid pro quo* and corrupt intent, these statutes do not, and thus do not qualify as bribery offenses against a foreign nation as required by Section 1956(c)(7). This would allow the government to convict Mr. Piñate of what amounts to a strict liability offense cloaked as a criminal. This Court should reject that possibility, and dismiss those prongs of Counts Three, Four, Five, and Six that impermissibly rely on these Philippine statutes.

IV.    *If this Court declines to dismiss the indictment, it should instruct the jury that a quid pro quo is required.*

Courts have made clear that merely tracking the language of a statute in an indictment is insufficient where a dispositive legal issue lurks beneath the surface. But if this Court is unconvinced that dismissal is warranted at this stage, this issue will remain live at trial. If this Court declines to grant this motion, this Court should revisit this issue at the Rule 29 stage based on the evidentiary record. And, if the case proceeds to the jury, this Court should instruct the jury that bribery *requires* a *quid pro quo*, and that should the jury determine that Mr. Piñate gave or attempted to give a gratuity, it is required to acquit him. Such a ruling would not only comport with the law; it would minimize the risk of retrial should Mr. Piñate be convicted on legally improper grounds.

18

Accordingly, a ruling on the core legal issue at this stage is essential.  While courts often address jury instruction questions mid-trial, the instructions on the elements of the FCPA and Philippine bribery laws may determine the contours of Mr. Piñate's defenses and influence the arguments he chooses to make.  A ruling on what the government is required to prove beyond a reasonable doubt – as a matter of law – will streamline trial and provide the parties with clarity on the nature and scope of the evidence, in addition to protecting the record in this matter.  *See generally United States v. Shotts*, 145 F.3d 1289, 1293 n.3 (11th Cir. 1998) ("A general verdict which may rest upon an insufficient legal theory must be reversed.").

## CONCLUSION

The Supreme Court has noted that while there is "a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest [is] limited to quid pro quo corruption." *Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 359 (2010).   Where there is no *quid pro quo*, there is no bribery, and the federal government's interest in preventing corruption is accordingly limited.

This may be a question of first impression, which is not particularly surprising given the recency of the Supreme Court's decision in *Snyder* and the relative paucity of FCPA prosecutions that proceed to trial. But it is not a close call.  Because the FCPA criminalizes *only* bribes and not the gratuities scheme alleged here, and the money laundering statutes' definition of "bribery" does not reach gratuities schemes, this Court should dismiss the indictment in full.

Dated: April 28, 2025

Respectfully submitted,

COLSON HICKS EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Tel: (305) 476-7400

By: /s/ Curtis B. Miner
      Curtis B. Miner, Esq.
      (Florida Bar No. 885681)
      E-mail: curt@colson.com
      Thomas A. Kroeger, Esq.
      (Florida Bar No. 19303)
      E-mail: tom@colson.com

*And*

MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004-2541
Tel: 202-739-5932
Sandra L. Moser, Esq. (*pro hac vice*)
E-mail: Sandra.moser@morganlewis.com
Justin D. Weitz, Esq. (*pro hac vice*)
E-mail: Justin.weitz@morganlewis.com

*Counsel for Defendant Roger Alejandro Piñate Martinez*

20

**CERTIFICATE OF CONFERRAL**

Pursuant to Local Rule 88.9(a), counsel have conferred with the government by telephone in a good faith effort to resolve the issues raised in the motion and have been advised by the government that it will oppose the motion.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing, including attachments, was filed conventionally with the Clerk of the Court on this 28th day of April, 2025, and that service will made on counsel of record pursuant to Local Rule 5.4(b)(1).

By:    /s/ *Curtis B. Miner*
       Curtis B. Miner, Esq.